# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BP RETAIL PARTNERS INC., | ) | Case No. 25-BK-03476 |
| BP RETAIL TX, LLC, | ) | Case No. 25-BK-03484 |
| R&R TENN REAL ESTATE HOLDINGS LLC, and | ) | Case No. 25-BK-03475 |
| COREY E. ROBINSON, | ) | Case No. 25-BK-03486 |
| | ) | |
| Debtors.[1] | ) | Hon. Randal S. Mashburn |
| | ) | Chapter 11 |
| | ) | (Joint Administration Requested) |

## DECLARATION OF COREY E. ROBINSON IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Corey E. Robinson, declare under penalty of perjury:

1. I am the Chief Executive Officer and principal of BP Retail Partners Inc., an Iowa corporation, BP Retail TX, LLC, an Iowa limited liability company, R&R Tenn Real Estate Holdings LLC, a Tennessee limited liability company (together with Corey Robinson, collectively, the "Debtors"). The Debtors' primary business, and the focus of these Chapter 11 cases, is operation of 12 Batteries Plus franchise locations in Texas, Iowa and Illinois, and certain related real estate activities.

2. As the Chief Executive Officer, I have extensive knowledge of the operations and financial conditions of the Debtors, including, among other things, (a) the structure of the Debtors' franchise agreements, (b) the Debtors' restructuring strategy, (c) the Debtors' vendor and creditor

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of Debtors' federal tax identification numbers are: BP Retail Partners Inc. (3363), BP Retail TX, LLC (4493), R&R Tenn Real Estate Holdings LLC (4489), and Corey E. Robinson (8728). The corporate headquarters and mailing address for BP Retail Partners Inc. is 3801 2nd Ave S Clinton, IA, 52732. The corporate headquarters and mailing address for BP Retail TX, LLC is 216 7th Ave. S. #1, Clinton, IA 52732.The corporate headquarters for R&R Tenn Real Estate Holdings LLC is 501 Union St., Suite 400, Nashville, TN 37219 and the mailing address is 3801 2nd Ave S Clinton, IA, 52732. The mailing address for Corey E. Robinson is 3801 2nd Ave S Clinton, IA, 52732.

1

relationships, (d) financial reporting, and (e) the Debtors' business plan for post-reorganization recovery.

3. Except as otherwise indicated, I base all facts set forth in this declaration (this "Declaration") on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition. If called to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtors.

4. On August 21, 2025 (the "Petition Date"), the Debtors commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee (the "Court").

5. I submit this Declaration to describe the Debtors' background and the circumstances that led to the Chapter 11 Cases. I also submit this Declaration in support of the relief requested by the Debtors in the "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings").

6. By the First Day Pleadings, the Debtors seek to, among other things:

    a. provide for joint administration of the Debtors' Chapter 11 Cases;

    b. obtain authority to use cash collateral to pay necessary expenses;

    c. allow for the continued payment of wage and tax obligations;

    d. ensure the continuation of the Debtors' cash management system without interruption;

    e. ensure the continuation of the Debtors' insurance contracts without interruption;

    f. provide adequate assurance of payment to the Debtors' utility providers;

    g. extend certain deadlines for filing schedules of assets and liabilities and statements of financial affairs; and

    h. set all of the First Day Pleadings for hearing.

7. I am familiar with each of the First Day Pleadings. Absent the relief requested in the First Day Pleadings, I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to continue their business operations and complete the necessary restructuring. I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and minimize disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value while pursuing confirmation of a reorganization plan. Finally, I believe that the First Day Pleadings reflect a thorough analysis by the Debtors' management team and their professional advisors, and capture relief that is critical to the success of these proceedings.

8. This Declaration is divided into three parts. **Part I** describes the Debtors' business, organizational structure, and prepetition indebtedness. **Part II** describes the circumstances leading to the commencement of these Chapter 11 Cases. **Part III** summarizes the First Day Pleadings and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the estates, as applicable.

I. DESCRIPTION OF THE DEBTORS

   A. The Debtors' Business

9. The Debtors operate a network of 12 Batteries Plus retail locations in Texas, Iowa and Illinois under franchise agreements with Batteries Plus, L.L.C. The stores offer retail and commercial sales of batteries, light bulbs, and phone repair services.

10. As of the Petition Date, the Debtors have approximately 52 employees, including both full-time and part-time staff, primarily store managers, sales associates, and repair technicians. Maintaining payroll and employee retention is critical to store-level continuity and future revenue.

11. Gross revenues from operations of the Debtors' Batteries Plus stores was $4,705,492 in 2023 and $6,442,685 in 2024.

### B. Formation and Organizational Structure

12. BP Retail Partners Inc., an Iowa corporation majority-owned and controlled by Corey Robinson, is the parent company through which the Debtors' Batteries Plus store operations are conducted. The company oversees the portfolio of 12 Batteries Plus locations, managing substantially all business functions, including but not limited to finance, accounting, purchasing, marketing, and payroll on a consolidated basis at the parent level.

13. BP Retail TX, LLC, an Iowa limited liability company wholly owned by BP Retail Partners Inc., was formed as a single-purpose subsidiary to acquire and operate four of the Texas store locations. While BP Retail TX, LLC holds title to, and performs the retail sales functions for those stores, it does not operate as a stand-alone business. All day-to-day operations for the Texas stores other than retail sales, along with the company's other locations, are integrated into and managed by the parent company.

14. R&R Tenn Real Estate Holdings LLC is a Tennessee limited liability company formed to identify, evaluate, and acquire commercial real estate in targeted markets. Tennessee offers significant advantages for real estate investment, including a favorable tax climate and strong long-term growth prospects. Although the company's launch coincided with financial and operational crises affecting the other businesses, which has temporarily slowed initial acquisitions, it has been actively engaged in market analysis, deal sourcing, and due diligence to position itself for future income-producing and value-appreciating investments.

### C. Debt Structure

15. The senior secured lender in these cases is Citizens First Bank, which is owed approximately $2,000,000 as of the Petition Date, secured by a first-priority lien on substantially

4
Case 3:25-bk-03476 Doc 3 Filed 08/21/25 Entered 08/21/25 19:41:25 Desc Main
Document Page 4 of 20

all business assets and real property located in East Moline, IL at which one of the stores operates. Unsecured and undersecured debts of Debtor BP Retail Partners Inc. total between $1,500,000 and $2,000,000.

16. Debtor BP Retail TX, LLC owes approximately $1,170,000 to Sydmor, Inc. (secured by assets in Texas[2], with guarantees by the other Debtors) and $250,000 in Texas taxes.

17. Corey Robinson's individual debts are primarily guarantees and responsible party liability related to the other Debtors, and debts of nearly $2,000,000 related to a now-defunct HVAC business, Midwest Climate Solutions, LLC.

### D. Assets

18. As of the Petition Date, the Debtors' assets consist primarily of a limited amount of cash, inventory at the Batteries Plus stores, and the East Molin, IL real estate valued between $620,000 and $650,000.

### E. Management Team

19. The Debtors' senior management consists of myself, Corey Robinson, as Chief Executive Officer; Danny Pen as Vice President; and Jason Smiley as General Manager of the Batteries Plus stores.

20. I, **Corey E. Robinson**, serve as Chief Executive Officer and have led the Debtors since inception. I have a background in operations, finance, and turnaround strategy. I previously served in leadership roles in franchise operations and consulting and I hold degrees in engineering and business.

---

[2] As noted in the Debtors' cash collateral motion, the validity, perfection, and enforceability of Sydmor's liens are subject to potential challenge.

21. **Danny Pen** is Vice President and oversees business operations, vendor relations, and financial management. Mr. Pen has over a decade of experience in franchise operations and small business management, with a specialization in retail scaling strategies.

22. **Jason Smiley** is the General Manager responsible for daily store operations, personnel supervision, and implementation of performance standards across the retail footprint. Mr. Smiley has extensive experience in consumer retail and team leadership within national franchise systems.

## II. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A. Financial Headwinds

23. Beginning in early 2023, supply chain disruptions and weakening retail foot traffic began to depress revenue. The business had previously expanded rapidly through debt-financed acquisitions and lease assumptions, anticipating continued growth and franchisor support.

24. The business has faced persistent cash flow challenges due to high debt service obligations from the Small Business Administration ("SBA") and seller-financed loans, franchise royalty and marketing arrears, and unresolved state and federal tax liabilities.

25. In 2024, store-level cash flow was insufficient to service debt, fund payroll, or cover critical operating costs.

26. In response to these challenges, the Debtors executed a comprehensive operational restructuring effective July 1, 2025. This included renegotiating underperforming leases, consolidating administrative functions, streamlining vendor relationships, and implementing cost-control measures at the store level. The restructuring is designed to return the business to breakeven operations and provide a platform for sustainable growth post-emergence.

27. However, operating margins fell below projections, and franchisor support declined. The Debtors have accumulated approximately $500,000 in inventory purchases, royalties and marketing arrears to Batteries Plus Franchising, L.L.C., prompting concerns of debranding and litigation.

28. Concurrently, the Debtors experienced tax compliance issues, with unpaid sales and employment taxes totaling approximately $300,000, which will be addressed in the Chapter 11 Cases.

29. In late 2024, vendors and equipment lessors initiated collection actions and lawsuits. Several store leases fell into default, and utilities were at risk of disconnection.

30. The Debtors' management team has worked tirelessly for the past two years to right the ship. Despite extensive negotiations with creditors and the franchisor, the absence of immediate working capital and risk of operational shutdown made Chapter 11 reorganization the only viable path to preserve enterprise value and jobs.

31. I acquired Midwest Climate Solutions, LLC in September 2023 and operated successfully through mid-January 2024. At that time, the former owner, who had remained involved in operations, departed due to health concerns. Following their exit, the business experienced severe operational disruptions, including high employee turnover, internal theft, and the failed implementation of a critical software platform despite the engagement of an expert consulting firm. From February 2024 onward, the business required monthly personal capital infusions ranging from $5,000 to $40,000 to maintain operations. In an effort to stabilize and grow, I pursued a strategic partnership with a larger private equity firm. However, rather than providing the anticipated working capital, the firm collected fees for strategic support that ultimately exacerbated internal instability. Their involvement triggered disruptive operational changes that

led to the loss of key employees and significant customer attrition, rendering the business unsustainable. Midwest Climate Solutions, LLC is no longer operating and has no funds with which to pay its outstanding debts. I guaranteed nearly all of the debt Midwest Climate Solutions, LLC acquired during my ownership and operation. My financial infusions in and personal liability related to this failed venture added to the financial distress of my other enterprises, but especially those of the Debtors.

### B. Financial Oversight and Cash Management

32. In early 2025, the Debtors engaged Estmere Accounting ("Estmere"), an outside accounting firm, to assist with internal accounting functions and implement a more standardized accounting and finance system. Estmere's work included improving financial reporting processes, overseeing reconciliations, introducing uniform store-level reporting practices, and enhancing internal controls during a period of operational and financial challenges.

33. Estmere has continued in the ordinary course to provide accounting support, including preparation of bi-weekly financial reports, vendor accounts payable tracking, tax compliance coordination, and preparation of financial statements and cash flow projections.

34. These improvements have increased the accuracy and timeliness of the Debtors' financial information, enhancing transparency to stakeholders and supporting effective cash management during the reorganization.

### C. Operational Restructuring and Strategic Turnaround

35. In April 2025, the Debtors initiated a comprehensive operational reorganization plan to address declining retail performance, unsustainable labor costs, and underperformance in commercial sales channels. This three-month initiative, led by senior management, culminated in a major restructuring executed effective July 1, 2025.

8
Case 3:25-bk-03476    Doc 3    Filed 08/21/25    Entered 08/21/25 19:41:25    Desc Main
Document    Page 8 of 20

36. The operational overhaul involved targeted reductions in non-essential roles, consolidation of underperforming units, and integration of virtual roles to reduce overhead. Labor optimization is projected to reduce monthly payroll expenses by $20,000 to $25,000, which will be reinvested in revenue-generating initiatives, technology upgrades, and working capital needs.

37. The Debtors adopted modern management frameworks including the entrepreneurial operating system to enhance execution discipline, process standardization, and accountability across all locations. Additionally, the Debtors implemented salesforce-powered sales processes and launched a predictable revenue model focused on outbound lead generation and pipeline development through specialized sales development representatives.

38. A critical supply relationship with East Penn Manufacturing, previously at risk due to payment delays, was stabilized through direct negotiations and renewed credit terms. The Debtors also initiated diversification of suppliers to reduce vendor concentration risk.

39. Overall, the Debtors' operational transformation positions the business for sustainable profitability, with increased gross margins to approximately 51%, reduced selling, general, and administrative costs, and a scalable sales structure designed to capture growth in commercial and retail channels.

### D. Post-Petition Objectives and Key Relationship Management

40. Although the situation is challenging, the Debtors believe that cash flow will be sufficient to support ongoing operations, maintain vendor relationships, and ensure uninterrupted store-level services during the pendency of these Chapter 11 Cases. If necessary to improve liquidity and operational efficiencies, the Debtors may seek debtor-in-possession financing, either in the form of a line of credit from a third party or extension of additional credit from the franchisor.

41. All essential insurance policies, including general liability, property, and workers' compensation, will remain in effect and be maintained throughout the Chapter 11 case to ensure business continuity and compliance.

42. The Debtors rely on a small number of critical vendors for inventory and supply continuity. These include East Penn Manufacturing and Ascent Battery Supply, both of whom are essential to product availability across our retail locations. The Debtors intend to work cooperatively with these vendors and ensure timely communications to preserve relationships.

43. The franchisor, Batteries Plus, L.L.C., is an important partner. The Debtors remain in full cooperation mode and intend to be transparent with franchise leadership throughout the case. The Debtors' goal is to emerge from this process as a stronger, compliant operator within the franchise system.

44. Post-petition, the Debtors will focus on stabilizing operations, right-sizing inventory levels, and preserving as many jobs as possible across the store network.

45. I have been operating at a substantially reduced salary relative to market norms for my role and responsibilities and will continue to do so through the pendency of these Chapter 11 Cases. Vice President Danny Pen and General Manager Jason Smiley have agreed to forego any variable compensation components during this reorganization process.

### III. SUMMARY OF THE FIRST DAY PLEADINGS[3]

46. Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed the First Day Pleadings. Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed. In my opinion,

---

[3] Capitalized, but otherwise undefined, terms used in this Section III shall have the meanings ascribed to such terms in the applicable First Day Pleading.

approval of the relief sought in the First Day Pleadings is critical to the Debtors' reorganization efforts.

47. Certain of the First Day Pleadings, specifically the motion to pay wages and taxes earned prepetition, request authority to pay certain prepetition claims. I am told by the Debtors' legal advisors that Rule 6003 of the Federal Rule of Bankruptcy Procedure provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein. With respect to the other First Day Pleadings, set forth below are the reasons why I believe it is imperative that the Court grant the relief requested.

    **A.**    **Expedited Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

48. Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only. Given the organizational structure of the Debtors, I believe that joint administration of the Chapter 11 Cases would provide significant administrative convenience without harming the substantive rights of any parties in interest. Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings, notices, and orders in each of the respective dockets. This, in turn, would save the Court, the Debtors, and other parties in interest substantial time and expense when preparing and filing such documents. Further,

joint administration would protect any parties in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each of the Debtors' cases.

49. Because the Debtors seek only administrative, not substantive, consolidation of the estates, joint administration would not adversely affect the Debtors' respective estates. I believe the relief requested in the Joint Administration Motion will not only preserve individual creditors' rights but also provide those creditors the benefit of cost reductions associated with joint administration.

### B. Expedited Motion for Entry of Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion")

50. Pursuant to the Cash Collateral Motion, the Debtors seek authority to use cash from operations to pay wages, insurance, rent, and other expenses as detailed in the Budget. Permitting the Debtors to use cash collateral will allow the Debtors to (a) avoid disruption of the business; (b) keep the workforce in place; and (c) complete this reorganization.

51. The Cash Collateral Motion includes details about creditors that may assert a lien on the Debtors' cash and other assets that may constitute cash collateral. As for adequate protection for the limited use of cash collateral, the Debtors propose to maintain the status quo and provide any valid secured creditors replacement liens in accordance with 11 U.S.C. §§ 361(2) and 552(b) to the extent of cash collateral actually expended, and on the same assets and in the same order of priority as existed immediately prior to the Petition Date.

52. I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable to the Debtors to continue operating their business during the Chapter 11 Cases without disruption. Accordingly, the Debtors respectfully request that the relief set forth in the Cash Collateral Motion be approved.

C. **Expedited Motion for Entry of Order (I) Authorizing Debtors to Pay Certain Prepetition (A) Wages and Salaries, (B) Reimbursable Employee Expenses, and (C) Employee Medical and Similar Benefits and (II) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Wages Motion")**

53. Pursuant to the Wages Motion, the Debtors seek, among other things: (a) authority to pay certain prepetition wages, salaries, and other compensation, taxes and withholdings, and certain other employee benefit program expenses; (b) to honor and continue benefit programs for employees; and (c) related relief.

54. As of the Petition Date, the Debtors have approximately 52 employees (collectively, the "Employees"), including both full-time and part-time staff, primarily store managers, sales associates, and repair technicians.

55. The Employees are integral to the Debtors' operations. They perform a wide variety of functions critical to the Debtors' ordinary course operations. As a whole, the Employees have an essential working knowledge of the Debtors' business that cannot easily be replaced. The Debtors have designed their compensation programs to attract, retain, and motivate their employees. The efforts of these Employees will ensure a smooth transition into chapter 11 and preservation of the value of the Debtors' business.

56. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Payroll Processing Fees;
- Withholding Obligations;
- Health Programs;
- Life Insurance;

- Workers' Compensation Program;
- 401(k) Plan; and
- Paid Leave.

57. Subject to the Court's approval, the Debtors intend to continue their Employee Compensation and Benefits Programs in the ordinary course, including honoring prepetition obligations due thereunder. The Debtors further request confirmation of their right to modify, change, and discontinue any of their Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during the Chapter 11 Cases, in each case, in their discretion and without the need for further Court approval, subject to other orders entered in the Chapter 11 Cases and the requirements of the Bankruptcy Code.

58. Specifically, in the Wages Motion, the Debtors seek authority, but not direction, to pay or honor up to the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Program:

| Prepetition Employee Obligations | Amount |
|---|---|
| Employee Compensation | $66,071.07 |
| Taxes and Withholding Obligations | $5,560.32 |
| Health Programs and other voluntary deductions | $2,711.68 |
| **Total** | **$74,343.07** |

59. The Debtors do not believe that any prepetition amounts owed to any Employees on account of the Employee programs exceed $15,150, and do not seek authority to pay any Employee in an amount exceeding $15,150 on account of prepetition claims.

60. Upon information and belief, the majority of Employees rely exclusively or primarily on the Employee Compensation and Benefit Programs to pay their daily living expenses and support themselves or their families. I believe that any delay in payments to the Employees could cause the Debtors to lose the benefit of the Employees' services, which would jeopardize

the Debtors' reorganization and lead to a rapid deterioration in the value of the business. Thus, Employees will face significant financial consequences if the Debtors cannot continue such programs in the ordinary course of business. The Debtors seek to minimize the personal hardship that the Employees would suffer if employee obligations are not paid when due and, consequently, submit that the relief requested is necessary and appropriate. Therefore, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable to the Debtors to continue operating their business during chapter 11 without disruption to maximize the value of their assets. Accordingly, the Debtors respectfully request that the relief set forth in the Wages Motion be approved.

        **D.    Expedited Motion for Entry of Order Authorizing Continued Maintenance and Use of Existing Bank Accounts and Cash Management System (the "Cash Management Motion")**

      61.    Pursuant to the Cash Management Motion, the Debtors seek, among other things: (a) authority to continue using their current cash management system (the "Cash Management System"), existing bank accounts (the "Bank Accounts"), and business forms (the "Business Forms"); (b) authority to open and close Bank Accounts as necessary; (c) authority for the Banks participating in the Cash Management System to honor certain transfers; and (d) related relief.

      62.    As described in greater detail in the Cash Management Motion, the Debtors maintain the Cash Management System in the ordinary course of their operations. A list of the Bank Accounts is attached to the Cash Management Motion. Because of the nature of the accounts and timing of payments the Debtors' Bank Accounts rarely, if ever, hold over $250,000.

      63.    Debtors' payroll is funded from the parent company's principal operating account bi-weekly. It is the account that receives all revenue and makes all ordinary disbursements. All vendors are paid from the same primary operating account.

64. In order to draw a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims, the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts for which the signature cards shall indicate that the debtor is a "Chapter 11 Debtor-in-Possession"; (b) establish a new payroll account; and (c) maintain any funds in excess of the amount required for current operations in an interest-bearing account.

65. Although I understand that the institutions at which the Bank Accounts are located are not listed on the United States Trustee's Approved List for the Middle District of Tennessee, I believe they are strong financial institutions and I further believe that changing bank accounts under the circumstances of these Chapter 11 Cases would not serve a meaningful purpose, but would be costly and severely detrimental to the Debtors' reorganization efforts.

66. The Debtors utilize the Bank Accounts to manage payments, make disbursements, including employee, vendor, and other operating payments, and to hold cash. The existing system allows the Debtors to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information. The Debtors have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

67. Accordingly, the Debtors respectfully request that the relief set forth in the Cash Management Motion be approved.

### E. Expedited Motion to Prohibit the Discontinuation of Utility Services, Approve Adequate Assurance of Payment, and Establish Procedures for Additional Adequate Assurance (the "Utilities Motion")

68. Pursuant to the Utilities Motion, the Debtors seek, among other things: (a) approval of the Debtors' proposed form of adequate assurance of postpetition payment to the Utility Companies; (b) approval of procedures for resolving any objections by the Utility Companies relating to the Debtors' proposed adequate assurance procedures set forth in the Utilities Motion (the "Adequate Assurance Procedures"); (c) a prohibition on the Utility Companies from altering, refusing, or discontinuing their services (collectively, the "Utilities Services") to, or discriminating against the Debtors solely on the basis of (i) the commencement of the Chapter 11 Cases, (ii) a debt that is owed by the Debtors for services rendered prior to the Petition Date, or (iii) on account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (d) related relief.

69. The Debtors operate 12 retail locations in 3 states. Any disruption of the Debtors' Utility Services would cause irreparable harm to the Debtors' business operations, their estates, their employees, and their customers, as it could result in the Debtors' inability to operate their business. Without the protections afforded by the Adequate Assurance Procedures, the Debtors could be forced to address *ad hoc* requests by Utility Companies in a disorganized manner in the initial, critical stages of their chapter 11 process, when their efforts should be focused on stabilizing their operations and maximizing value for all of their stakeholders. The orderly process contemplated by the Adequate Assurance Procedures is necessary for a smooth transition by the Debtors into chapter 11 and will aid in their chapter 11 efforts. Moreover, the Adequate Assurance Procedures will establish a fair process that will ensure all parties act in good faith.

70. The Chapter 11 Cases simply will not succeed if the Debtors cannot be assured continual and uninterrupted Utility Services. Any disruption of the Utility Services could have a significant impact on the Debtors' business operations and reorganization efforts.

71. Accordingly, the Debtors respectfully request that the relief set forth in the Utilities Motion be approved.

      **F.    Expedited Motion of Debtors for Entry of an Order Authorizing Debtors to (I) Continue Their Insurance Program, (II) Continue to Finance Insurance Agreements, and (III) Pay All Prepetition and Postpetition Obligations With Respect Thereto, and (IV) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Insurance Obligations (the "<u>Insurance Motion</u>")**

72. Pursuant to the Insurance Motion, the Debtors seek authority to (a) continue all insurance coverage in effect as of the Petition Date, including, without limitation, general liability, property, workers' compensation, automobile, and directors and officers policies; (b) honor obligations under existing insurance premium financing agreements; and (c) pay any related prepetition amounts and broker fees in the ordinary course of business. Continuation of the Debtors' insurance programs is necessary to comply with applicable law, maintain business operations, and protect the Debtors' assets and employees.

73. The Insurance Motion provides additional detail regarding the Debtors' insurance policies, the amounts owed under the premium financing agreements, and the payment schedules. The relief requested will ensure uninterrupted coverage while avoiding cancellation or default under any policy.

74. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary to preserve the value of the Debtors' assets and comply with legal requirements. Accordingly, the Debtors respectfully request that the relief set forth in the Insurance Motion be approved.

      **G.    Expedited Motion for Entry of an Order Granting Additional Time to File Schedules and Statements (the "<u>Extension Motion</u>")**

75. I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors to file with the Court within 14 days of the Petition Date: (a) their schedules of assets and liabilities;

(b) their statements of financial affairs; (c) their schedules of current income and expenditures; (d) their lists of executory contracts and unexpired leases; and (e) their lists of equity security holders (collectively, the "Schedules and Statements").

76. By the Extension Motion, the Debtors are seeking entry of an order extending the time for filing the Schedules and Statements for an additional 21 days (for a total of 35 days from the Petition Date). The Debtors have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but the Debtors believe that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

77. The Debtors are filing the Extension Motion because they have numerous creditors and other interested parties, and the Debtors require additional time to accurately review and report all of the required information. Given the current state of the business and the substantial disclosure requirements, the Debtors have not had ample opportunity to gather all of the necessary information to prepare and file their Schedules and Statements. An extension will allow the Debtors to properly prepare this information in an accurate and efficient manner. Accordingly, the Debtors respectfully request that the relief set forth in the Extension Motion be approved.

H. **Notice and Motion for Order Setting First Day Hearing on Shortened Notice (the "Expedited Hearing Motion")**

78. The First Day Pleadings described above involve matters that require an emergency and expedited hearing and the Debtors are requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing subject to the Court's availability on August 26 or 27, 2025, and that the Court approve the form of notice thereof.[4]

---

4 The Expedited Hearing Motion is being filed with the Notice required by revised LBR 9075-1.

19
Case 3:25-bk-03476    Doc 3    Filed 08/21/25    Entered 08/21/25 19:41:25    Desc Main
Document      Page 19 of 20

79. The relief requested in the Expedited Hearing Motion is necessary to obtain expedited relief on the First Day Pleadings. As described in detail in each of the First Day Pleadings, the expedited relief requested in the First Day Pleadings is essential to: (a) ensure a smooth transition into chapter 11; (b) maintain the Debtors' operations and business throughout the Chapter 11 Cases; (c) efficiently administer the bankruptcy cases; and (d) establish the basis for the Debtors' restructuring efforts. The Expedited Hearing Motion and the First Day Pleadings are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations and transition into operating as chapter 11 debtors in possession.

## IV. **CONCLUSION**

80. For the reasons stated herein, and in each of the First Day Pleadings filed concurrently or in connection with the Chapter 11 Cases, the Debtors respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: August 21, 2025.       */s/ Corey E. Robinson*
                                                       Corey E. Robinson